1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

BRIAN MOSS, individually and on behalf all others similarly situated,

               Plaintiff(s),

    v.

RECEIVABLES PERFORMANCE MANAGEMENT, LLC

               Defendant.

Case No._____

**CLASS ACTION COMPLAINT**

**Demand For Jury Trial**

## CLASS ACTION COMPLAINT

      Plaintiff(s) Brian Moss ("Plaintiff(s)") bring this action, on behalf of themselves and all others similarly situated, against Defendant Receivables Performance Management, LLC ("RPM or "Defendant"). Plaintiff(s) seek to obtain damages, restitution, and injunctive relief for a class of individuals ("Class" or "Class Members") who are similarly situated and have received notices of the data breach from RPM. Plaintiff(s) make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

### I.   NATURE OF THE ACTION

      1.     This class action arises out of an April to May 2021 data breach ("Data Breach") of documents and information stored on the computer network of RPM, a company that offers

CLASS ACTION COMPLAINT - 1

MASON LLP
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015 ~ (202) 429-2290

collection services.[1]

2.      According to its website, RPM works as "a national leader in accounts receivable management." The company collects debt from the "Credit Card, Retail Card, Auto Finance, large Utilities to National Telecommunications Companies, to Healthcare" industries.[2]

3.      On its computer network, RPM holds and stores certain highly sensitive personally identifiable information ("PII" or "Private Information") of the Plaintiff(s) and the putative Class Members, who are customers of companies that RPM provides debt collection services for, i.e., individuals who provided their highly sensitive and private information in exchange for business services, either to RPM directly or to RPM's customers.

4.      According to the Notice of Data Breach Letter that RPM sent to Plaintiff(s) and Class Members, as well as those it sent to State Attorneys General, it first "became aware of a data security incident that impacted its server infrastructure and took [its] systems offline" on or about May 12, 2021, and began investigating. "This forensic investigation determined that first access to RPM's systems occurred on approximately April 8, 2021, with the ransomware launched on May 12. 2021."[3]

5.      Thus, RPM did not realize for over 4 weeks that the PII of Plaintiff(s) and Class was actively being accessed and acquired (also called exfiltrated) by cyber criminals.

6.      RPM finally began notifying approximately 3,766,573 victims on or about November 21, 2022, *over a year and a half after the Data Breach began*.[4]

7.      As a result of RPM's Data Breach, Plaintiff(s) and thousands (if not more) of Class Members suffered ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the

---

[1] https://apps.web.maine.gov/online/aeviewer/ME/40/11ca5a7c-b09f-404a-81c6-b683305543a1.shtml / (last visited Jan. 17, 2023).
[2] https://receivablesperformance.com/about-us (last visited Jan. 17, 2023).
[3] *See* Plaintiff's Notice Letter, Exh. A
[4] https://apps.web.maine.gov/online/aeviewer/ME/40/11ca5a7c-b09f-404a-81c6-b683305543a1.shtml (last visited Jan. 17, 2023).

CLASS ACTION COMPLAINT - 2

MASON LLP
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015 ~ (202) 429-2290

effects of the attack.

8.    In addition, Plaintiff(s)' and Class Members' sensitive personal information—which was entrusted to Defendant—is now in the control of cybercriminals, although Defendant claims in the notice letters that it understands the importance of protecting your information."[5]

9.    The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect Plaintiff(s) and Class Members' Private Information.

10.    Plaintiff(s) bring this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that they collected and maintained, and for failing to provide timely and adequate notice to Plaintiff(s) and other Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

11.    Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. The mechanism of the cyberattack and potential for improper disclosure of Plaintiff(s)' and Class Members' Private Information was a known risk to Defendant. Thus, Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

12.    Defendant disregarded the privacy and property rights of Plaintiff(s) and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and

---

[5] Exh. A

CLASS ACTION COMPLAINT - 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

security practices to safeguard Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff(s) and Class Members prompt, accurate, and complete notice of the Data Breach.

13.     In addition, Defendant and its employees failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant properly monitored its computers, it would have discovered the intrusion sooner, and potentially been able to mitigate the injuries to Plaintiff(s) and the Class.

14.     Plaintiff(s)' and Class Members' identities are now at substantial and imminent risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained (including Social Security numbers) is now in the hands of data thieves. Plaintiff(s) and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

15.     Plaintiff(s) and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

16.     Through this Complaint, Plaintiff(s) seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach (the "Class").

17.     Accordingly, Plaintiff(s) bring this action against Defendant for: (i) negligence, (ii) negligence per se, (iii) intrusion upon seclusion/ invasion of privacy, and (iv) unjust enrichment.

18.     Plaintiff(s) seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, statutory damages, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate, long

CLASS ACTION COMPLAINT - 4

term credit monitoring services funded by Defendant, and declaratory relief.

## II.    **PARTIES**

19.    Plaintiff Brian Moss is, and at all times relevant to this Complaint was, an individual citizen of the State of New York, residing in the city of Bronx (Bronx County). On or about November 23, 2022, Plaintiff Moss received a Notice of the Data Breach from RPM. A copy of the notice he received is dated November 21, 2022, and is attached as Exhibit A (the "Notice Letter").

20.    Defendant Receivables Performance Management, LLC, is a limited liability company, registered in the State of Washington. RPM's Principal Office is located at 20818 44th Avenue West, Suite 240, Lynnwood, Washington 98036.

21.    All of Plaintiff(s)' claims stated herein are asserted against Defendant RPM, and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## III.    JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

23.    The Court has general personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business or business venture in Washington; it is registered with the Secretary of State in Washington as a limited liability company; it maintains its headquarters in Washington; and committed tortious acts in Washington.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the district within which RPM has the most significant contacts.

CLASS ACTION COMPLAINT - 5

1

## IV.    STATEMENT OF FACTS

2

**Nature of Defendant's Business.**

3    25.    According to its website, RPM is a debt collection agency that works with

4    multiple industries such as credit card, utilities, healthcare, telecommunications, retail, etc.[6]

5    26.    RPM says it was founded in 2002, and has an executive management team with a

6    combined experience of over 175 years.[7]

7

8    27.    RPM has around 370 employees, with 2 locations. It holds active debt portfolios

9    of $3.7 billion and in just 2009 had an estimated revenue of over $18,300,000.[8]

10    28.    RPM states in its Privacy Policy, it "recognizes and respects the

11    information/legislation set forth by Federal (GLB, FDCPA, HIPAA) and State guidelines

12    pertaining to privacy matters regarding client, customer and other 3rd party information."

13    Additionally, "As financial services professionals entrusted with sensitive information, we

14    respect the privacy of our clients, and the privacy of their customers. We are committed to

15    treating customer's information responsibly."

16

17    29.    RPM collects PII of consumers from its clients who are seeking its financial and

18    other services. This PII includes, *inter alia,* consumers' full names, multiple forms of contact

19    information including phone numbers, addresses, and email addresses, Social Security numbers,

20    and other financial and credit information.

21    30.    RPM, in the regular course of its business, collects and maintains the PII of

22    consumers as a requirement of its business practices.

23

24    31.    Clients seeking its services entrusted RPM with consumers' PII with the mutual

25

26    [6] https://receivablesperformance.com/about-us (last visited Jan. 17, 2023).
     [7] https://receivablesperformance.com/corporate-profile (last visited Jan. 17, 2023).
27    [8] https://receivablesperformance.com/leadership (last visited Jan. 17, 2023).

CLASS ACTION COMPLAINT - 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

understanding that this highly sensitive private information was confidential and would be properly safeguarded from misuse and theft.

32.     RPM promises in it its Privacy Policy that it "Our employees are educated on the importance of maintaining the confidentiality of information."[9]

33.     In the course of collecting Private Information from consumers, including Plaintiff(s) and Class Members, RPM promised to provide confidentiality and adequate security for Private Information through its applicable Privacy Policy and in compliance with statutory privacy requirements applicable to the financial services industry.

34.     Plaintiff(s) and the Class Members, as consumers, relied on the promises and duties of RPM to keep their sensitive PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Consumers, in general, demand that businesses that require highly sensitive PII will provide security to safeguard their PII, especially when their Social Security numbers, driver's license, state identification, and passports are involved.

35.     In the course of their dealings, Plaintiff(s) and Class Members provided RPM (either directly or through RPM's business customers) with all or most of the following types of Private Information:

- First and last names;
- Home addresses;
- Email addresses;
- Phone numbers;
- Social Security numbers;
- Employers;

---

[9] https://receivablesperformance.com/PrivacyPolicy.aspx (last visited Jan. 17, 2022).

CLASS ACTION COMPLAINT - 7

- Account numbers; and

- Bank account or payment card information.

36.     RPM had a duty to adopt reasonable measures to protect Plaintiff(s)' and Class Members' PII from unauthorized disclosure to third parties.

**The Data Breach.**

37.     According to its Notice Letters, on May 21, 2021, RPM discovered "a data security incident that impacted its server infrastructure and took [its] systems offline."[10]

38.     After investigation, RPM realized that its computer network was openly accessed by an unknown party for over 4 weeks, from April 8, 2021, to May 12, 2021. [11]

39.     The Notice Letter does not disclose why the Data Breach was occurring for over 4 weeks before anyone noticed.[12]

40.     Notice Letters were not sent until late November 2022 despite RPM's knowledge of the Data Breach since May of 2021.

41.     RPM claims the investigation concluded around October 2, 2022 (more than a year after the breach), and yet still cannot specify on the information that was stolen except that it vaguely states it "identified the presence of your personal information that were reviewed, including Social Security number."[13]

42.     A review of various State Attorneys General websites shows that RPM only began to notify State Attorney Generals of this Data Breach in late-November 2022, months after statutory notification was required by the laws of the various states. Time is of the essence when

---

[10] Notice Letter, Ex. A.
[11] *Id.*
[12] *Id.*
[13] *Id.*

CLASS ACTION COMPLAINT - 8

trying to protect against identity theft after a data breach, so early notification is critical.[14]

43.    Because of this targeted, intentional cyberattack, data thieves were able to gain access to and obtain data from RPM that included the Private Information of Plaintiff(s) and Class Members.

44.    Upon information and belief, the Private Information stored on RPM's network was not encrypted.

45.    Plaintiff(s)' Private Information was accessed and likely stolen in the Data Breach. Plaintiff(s) reasonably believe their stolen Private Information is currently available for sale on the Dark Web because that is the *modus operandi* of cybercriminals who target businesses that collect highly sensitive Private Information.

46.    As a result of the Data Breach, RPM now encourages Class Members to enroll in credit monitoring, fraud consultation, and identity theft restoration services, a tacit admission of the imminent risk of identity theft faced by Plaintiff(s) and Class Members.[15]

47.    That RPM is encouraging Plaintiff(s) and Class Members to enroll in credit monitoring and identity theft restoration services is an acknowledgment that the impacted consumers are subject to a substantial and imminent threat of fraud and identity theft.

48.    RPM had obligations created by contract, industry standards, statutes, and common law to keep Plaintiff(s)' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

49.    RPM could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

---

[14]    https://apps.web.maine.gov/online/aeviewer/ME/40/11ca5a7c-b09f-404a-81c6-b683305543a1.shtml (last accessed Jan. 17, 2023).
[15] Notice Letter, Ex. A.

CLASS ACTION COMPLAINT - 9

*Defendant Acquires, Collects, and Stores PII.*

50.     RPM acquires, collects, and stores a massive amount of PII of consumers for its business purposes as it provides debt collection services to third-party businesses (*i.e.*, RPM's customers). Upon information and belief, RPM may not be properly deleting or destroying the PII records of its former customers or for those consumers whose debts have been fully satisfied.

51.     By obtaining, collecting, and using Plaintiff(s)' and Class Members' PII for its own financial gain and business purposes, Defendant assumed legal and equitable duties and knew that it was responsible for protecting Plaintiff(s)' and Class Members' PII from disclosure.

52.     Plaintiff(s) and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

53.     Plaintiff(s) and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### The Data Breach was a
### Foreseeable Risk of which Defendant was on Notice

54.     It is well known that PII, including Social Security numbers in particular, is a valuable commodity and a frequent, intentional target of cyber criminals. Companies that collect such information, including RPM, are well-aware of the risk of being targeted by cybercriminals.

55.     Individuals place a high value not only on their PII, but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

56.     A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount

CLASS ACTION COMPLAINT - 10

the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (*e.g.*, postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss." [16]

57.    Individuals, like Plaintiff(s) and Class members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing your DNA for hacker's purposes.

58.    Data Breach victims suffer long-term consequences when their social security numbers are taken and used by hackers. Even if they know their social security numbers are being misused, Plaintiff(s) and Class Members cannot obtain new numbers unless they become a victim of social security number misuse.

59.    The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same." [17]

60.    In 2021, there were a record 1,862 data breaches last year, surpassing both 2020's

---

[16] "Victims of Identity Theft, 2018," U.S. Department of Justice (April 2021, NCJ 256085) available at: https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed January 18, 2023).
[17] https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed January 18, 2023).

CLASS ACTION COMPLAINT - 11

total of 1,108 and the previous record of 1,506 set in 2017.[18]

61.    Additionally in 2021, there was a 15.1% increase in cyberattacks and data breaches since 2020. Over the next two years, in a poll done on security executives, they have predicted an increase in attacks from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[19]

62.    In light of high-profile data breaches at other industry leading companies, including Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), RPM knew or should have known that its computer network would be targeted by cybercriminals.

63.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

64.    According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data." [20] This publication also explains that

---

[18]  https://www.cnet.com/tech/services-and-software/record-number-of-data-breaches-reported-in-2021-new-report-says/ (last accessed Jan. 17, 2023).
[19]    https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last accessed Jan. 17, 2023).
[20]    https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last accessed Jan. 17, 2023).

CLASS ACTION COMPLAINT - 12

"[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity." [21]

65.    Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, RPM failed to take appropriate steps to protect the PII of Plaintiff(s) and the proposed Class from being compromised.

***RPM Had a Duty***
***to Properly Secure Private Information***

66.    At all relevant times, RPM had a duty to Plaintiff(s) and Class Members to properly secure their PII, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiff(s) and Class Members, and to promptly notify Plaintiff(s) and Class Members when RPM became aware that their PII was compromised.

67.    RPM had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, RPM breached its common law, statutory, and other duties owed to Plaintiff(s) and Class Members.

68.    Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

---

[21] *Id.*

CLASS ACTION COMPLAINT - 13

MASON LLP
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015 ~ (202) 429-2290

a.   Maintaining a secure firewall configuration;

b.   Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

c.   Monitoring for suspicious or irregular traffic to servers;

d.   Monitoring for suspicious credentials used to access servers;

e.   Monitoring for suspicious or irregular activity by known users;

f.   Monitoring for suspicious or unknown users;

g.   Monitoring for suspicious or irregular server requests;

h.   Monitoring for server requests for PII;

i.   Monitoring for server requests from VPNs; and

j.   Monitoring for server requests from Tor exit nodes.

69.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[22] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[23]

70.    The ramifications of RPM's failure to keep consumers' PII secure are long lasting and severe. Once PII is stolen, particularly Social Security and driver's license numbers, fraudulent use of that information and damage to victims including Plaintiff(s) and the Class may continue for years.

---

[22] 17 C.F.R. § 248.201 (2013).
[23] *Id.*

CLASS ACTION COMPLAINT - 14

*The Value of Personal Identifiable Information*

71.    The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200.[24]

72.    Criminals can also purchase access to entire company's data breaches from $900 to $4,500.[25]

73.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[26]

74.    Attempting to change or cancel a stolen Social Security number is difficult if not nearly impossible. An individual cannot obtain a new Social Security number without evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of

---

[24] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Jan. 18, 2023).
[25] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/(last accessed Jan. 18, 2023).
[26] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Jan. 18, 2023).

CLASS ACTION COMPLAINT - 15

a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

75.     Even a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[27]

76.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[28]

77.     PII can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number. This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[29]

78.     Given the nature of this Data Breach, it is foreseeable that the compromised PII can be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Class Members' PII can easily obtain Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

79.     The Private Information compromised in this Data Breach is static and difficult, if not impossible, to change (such as Social Security numbers).

---

[27] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last accessed Jan. 18, 2023).
[28] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Jan. 18, 2023).
[29] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n. 1 (last accessed Jan. 18, 2023).

CLASS ACTION COMPLAINT - 16

80.    Moreover, RPM has offered only a limited subscription for identity theft monitoring and identity theft protection through IDX. Its limitation is inadequate when IDX's victims are likely to face many years of identity theft.

81.    Furthermore, Defendant RPM's credit monitoring offer and advice to Plaintiff(s) and Class Members squarely places the burden on Plaintiff(s) and Class Members, rather than on the Defendant, to monitor and report suspicious activities to law enforcement. In other words, RPM expects Plaintiff(s) and Class Members to protect themselves from its tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiff(s) and Class Members in credit monitoring services upon discovery of the breach, Defendant merely sent instructions to Plaintiff(s) and Class Members about actions they can affirmatively take to protect themselves.

82.    These services are wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud, and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiff(s)' and Class Members' PII.

83.    The injuries to Plaintiff(s) and Class Members were directly and proximately caused by RPM's failure to implement or maintain adequate data security measures for the victims of its Data Breach.

### *RPM Failed to Comply with FTC Guidelines*

84.    Federal and State governments have established security standards and issued recommendations to mitigate the risk of data breaches and the resulting harm to consumers and financial institutions. The FTC has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security

CLASS ACTION COMPLAINT - 17

should be factored into all business decision-making.[30]

85.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[31] The guidelines note businesses should protect the personal consumer and consumer information that they keep, as well as properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.

86.    The FTC emphasizes that early notification to data breach victims reduces injuries: "If you quickly notify people that their personal information has been compromised, they can take steps to reduce the chance that their information will be misused" and "thieves who have stolen names and Social Security numbers can use that information not only to sign up for new accounts in the victim's name, but also to commit tax identity theft. People who are notified early can take steps to limit the damage."[32]

87.    The FTC recommends that companies verify that third-party service providers have implemented reasonable security measures.[33]

88.    The FTC recommends that businesses:

    a.    Identify all connections to the computers where you store sensitive information.

---

[30]    Federal    Trade    Commission,    *Start    With    Security,    available    at*: https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf  (last accessed Jan. 17, 2023).

[31] Federal Trade Commission, *Protecting Personal Information: A Guide for Business, available at*: https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last accessed Jan. 17, 2023).

[32]  https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business  (last accessed Jan. 17, 2023).

[33] FTC, *Start With Security*, *supra* note 30.

CLASS ACTION COMPLAINT - 18

b. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

d. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e. Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks

f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the

CLASS ACTION COMPLAINT - 19

day.

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

89. The FTC has brought enforcement actions against businesses for failing to protect consumer and consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

90. Because Class Members entrusted RPM with their PII, RPM had, and has, a duty to the Plaintiff(s) and Class Members to keep their PII secure.

91. Plaintiff(s) and the other Class Members reasonably expected that when they provide PII to RPM (or to RPM's customers), RPM would safeguard their PII.

92. RPM was at all times fully aware of its obligation to protect the personal and financial data of consumers, including Plaintiff(s) and members of the Class. RPM was also aware of the significant repercussions if it failed to do so. Its own Privacy Policies, quoted above, acknowledges this awareness.

93. RPM's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—including Plaintiff(s)' and Class Members' first names, last names, addresses, and Social Security numbers, and other highly sensitive and confidential information—constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

CLASS ACTION COMPLAINT - 20

***Data Breaches Put Consumers at an Increased Risk***
***Of Fraud and Identify Theft***

94.    Data Breaches such as the one experienced here are especially problematic because of the disruption they cause to the overall daily lives of victims affected by the attack.

95.    In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach.[34] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. See GAO chart of consumer recommendations, reproduced and attached as Exhibit B. It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiff(s) and Class) must take after a breach like RPM's are both time consuming and of only limited and short term effectiveness.

96.    The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record," discussing the same in a 2007 report as well ("2007 GAO Report"). [35]

97.    The FTC, like the GAO (see Exhibit B), recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[36]

---

[34] https://www.gao.gov/assets/gao-19-230.pdf (last accessed Jan. 17, 2023). *See* attached as Ex. B.
[35] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Jan. 17, 2023) ("2007 GAO Report").
[36] *See* https://www.identitytheft.gov/Steps (last visited Jan. 17, 2023).

CLASS ACTION COMPLAINT - 21

98.     Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

99.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

100.    The FTC's "Warning Signs of Identity Theft" list of "clues" that a person has already had their information stolen includes, *inter alia*:

- Seeing unrecognized withdrawals from a bank account;

- Debt collectors calling about unknown/unrecognized debts;

- Finding unfamiliar accounts or charges on a credit report;

- Medical bills for services not used;

- A health plan refusing coverage because medical records show a condition the person does not have; and

- IRS notification of more than one tax return was filed under a person's Social Security number, or that income from an employer the person does not work for.[37]

101.    Theft of Private Information is also gravely serious. PII/PHI is a valuable property right.[38]

102.    It must also be noted there may be a substantial time lag – measured in years --

---

[37] *See* https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft (last Jan. 17, 2023).

[38] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

CLASS ACTION COMPLAINT - 22

between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* 2007 GAO Report, at p. 29.

103.    Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

104.    There is a strong probability that the entirety of the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff(s) and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff(s) and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

### *Plaintiff(s) and Class Members Have Suffered Concrete Injuries.*

105.    Plaintiff(s) and Class Members reasonably expected that Defendant would provide adequate security protections for their PII, and Class Members provided Defendant with sensitive personal information, including their names, addresses, and Social Security numbers.

106.    Defendant's poor data security deprived Plaintiff(s) and Class Members of the benefit of their bargain. Plaintiff(s) and other individuals whose PII was entrusted with RPM understood and expected that, as part of that business relationship, they would receive data security, when in fact Defendant did not provide the expected data security. Accordingly,

CLASS ACTION COMPLAINT - 23

Plaintiff(s) and Class Members received data security that was of a lesser value than what they reasonably expected. As such, Plaintiff(s) and the Class Members suffered pecuniary injury.

107.    Cybercriminals intentionally attack and exfiltrate PII to exploit it. Thus, Class Members are now, and for the rest of their lives will be, at a heightened and substantial risk of identity theft. Plaintiff(s) have also incurred (and will continue to incur) damages in the form of, inter alia, loss of privacy and costs of engaging adequate credit monitoring and identity theft protection services.

108.    The cybercriminals who obtained the Class Members' PII may exploit the information they obtained by selling the data in so-called "dark markets" or on the "dark web." Having obtained these names, addresses, Social Security numbers, and other PII, cybercriminals can pair the data with other available information to commit a broad range of fraud in a Class Member's name, including but not limited to:

- obtaining employment;
- obtaining a loan;
- applying for credit cards or spending money;
- filing false tax returns;
- stealing Social Security and other government benefits; and
- applying for a driver's license, birth certificate, or other public document.

109.    In addition, if a Class Member's Social Security number is used to create false identification for someone who commits a crime, the Class Member may become entangled in the criminal justice system, impairing the person's ability to gain employment or obtain a loan.

110.    As a direct and/or proximate result of Defendant's wrongful actions and/or inaction and the resulting Data Breach, Plaintiff(s) and the other Class Members have been deprived of the value of their PII, for which there is a well-established national and international

MASON LLP
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015 ~ (202) 429-2290

market.

111.    Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

112.    Accordingly, Defendant's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff(s) and the other Class Members at an imminent, immediate, and continuing increased risk of identity theft and identity fraud. Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach." Javelin Strategy & Research, a leading provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[39] Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that have not yet been exploited by cybercriminals bears a high risk that the cybercriminals who now possess Class Members' PII will do so at a later date or re-sell it.

113.    As a result of the Data Breach, Plaintiff(s) and Class Members have already suffered injuries, and each are at risk of a substantial and imminent risk of future identity theft.

114.    Although RPM admits that the "the unauthorized actor deployed certain data extraction tools" on its computer systems. Cybercriminals actually exfiltrated the PII that was accessed.[40]

### Plaintiff's Experience

---

[39] The Consumer Data Insecurity Report: Examining The Data Breach- Identity Fraud Paradigm In Four Major Metropolitan Areas, (*available at* https://www.it.northwestern.edu/bin/docs/TheConsumerDataInsecurityReport_byNCL.pdf) (last accessed Jan. 17, 2023).
[40] See Notice Letter, Ex. A.

CLASS ACTION COMPLAINT - 25

MASON LLP
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015 ~ (202) 429-2290

115. Plaintiff Brian Moss is, and at all times relevant to this Complaint was, a resident and citizen of the State of New York.

116. Plaintiff Moss is not quite sure what his connection to RPM is other than RPM may have retrieved his information from one of its clients that he is affiliated with. Upon information and belief, RPM may have required a client of RPM to provide it with his PII, or possibly received a payment for which he was required to provide PII. He is unsure of how RPM received his PII.

117. On or about November 23, 2022, Plaintiff Moss received the Notice of Data Breach letter, which indicated that RPM had known about the Data Breach for months. The letter informed him that his PII was accessed by an unknown party. The letter stated that the impacted information may have included his personal information including his Social Security number, but did not expand on what additional information was stolen as well.

118. Plaintiff Moss is alarmed by his Personal Information being accessed and stolen by an unknown cybercriminal, and even more by the fact that his PII was identified as among the breached data on RPM's computer system despite not being completely aware of his relationship to this company.

119. Plaintiff Moss has already started to feel the effects from this Data Breach. On January 11, 2022, he noticed an unauthorized charge by Hotelogical of $209.77 to his Chase Bank account. Given its timing relative to the Data Breach at RPM, he reasonably believes that this fraudulent activity is related to the Data Breach.

120. Plaintiff Moss has also received information that someone has tried to take out a fraudulent unemployment claim with his PII.

121. Plaintiff Moss has been receiving a combination of around 3 spam calls and many spam emails per day. He believes that the increased spam he is receiving is related to this Data

CLASS ACTION COMPLAINT - 26

Breach.

122.    Plaintiff Moss is concerned that the spam calls and texts are being placed with the intent of obtaining more personal information from him and committing identity theft by way of a social engineering attack.

123.    In response to RPM's Notice of Data Breach, Plaintiff will be required to spend time dealing with the consequences of the Data Breach, which will continue to include time spent verifying the legitimacy of the Notice of Data Breach, exploring credit monitoring and identity theft insurance options, self-monitoring her accounts, and freezing his credit. He realizes he will likely have to spend about an hour a day verifying financial accounts to check for fraudulent activities. The time he is forced to spend monitoring and securing his accounts has been lost forever and cannot be recaptured.

124.    Immediately after receiving the Notice Letter, Plaintiff spent time discussing his options with a law firm, contacted Transunion to add extra security to his accounts, and froze his credit in an effort to mitigate the damage caused by RPM.

125.    Plaintiff is very careful about sharing PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

126.    Plaintiff suffered actual injury in the form of damages and diminution in the value of his PII—a form of intangible property that was entrusted to RPM.

127.    Plaintiff has suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

128.    Plaintiff Moss reasonably believes that his Private Information may have already been sold by the cybercriminals. Had he been notified of RPM's breach in a timelier manner, he could have attempted to mitigate his injuries.

129.    Plaintiff Moss has suffered imminent and impending injury arising from the

CLASS ACTION COMPLAINT - 27

substantially increased risk of fraud, identity theft, and misuse resulting from his stolen PII being placed in the hands of unauthorized third parties and possibly criminals.

130.     Plaintiff has a continuing interest in ensuring that his PII, which upon information and belief remains backed up and in RPM's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

131.     Plaintiff(s) bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class") under Federal Rule of Civil Procedure 23.

132.     Plaintiff(s) propose the following Class definition, subject to amendment as appropriate:

> All persons whose Private Information was maintained on Defendant RPM, Inc.'s computer systems and compromised in its Data Breach that occurred between April 2021 and May 2021.

133.     Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

134.     Plaintiff(s) hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

135.     <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff(s) at this time, based on information and belief, the Class consists of thousands of persons whose data was compromised in Data Breach.

136.     <u>Commonality</u>. There are questions of law and fact common to the Class, which

MASON LLP
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015 ~ (202) 429-2290

predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff(s)' and Class Members' Private Information;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f. Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g. Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i. Whether Plaintiff(s) and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j. Whether Defendant's conduct was negligent;

k. Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

l. Whether Defendant failed to provide notice of the Data Breach in a timely manner; and

m. Whether Plaintiff(s) and Class Members are entitled to damages, civil

CLASS ACTION COMPLAINT - 29

penalties, punitive damages, and/or injunctive relief.

137.    <u>Typicality</u>. Plaintiff(s)' claims are typical of those of other Class Members because Plaintiff(s)'s Private Information, like that of every other Class member, was compromised in the Data Breach.

138.    <u>Adequacy of Representation</u>. Plaintiff(s) will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff(s)' Counsel are competent and experienced in litigating Class actions.

139.    <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff(s) and Class Members, in that all the Plaintiff(s)' and Class Members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

140.    <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

141.    Defendant has acted on grounds that apply generally to the Class as a whole, so

CLASS ACTION COMPLAINT - 30

MASON LLP
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015 ~ (202) 429-2290

that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

142.    Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

- Whether Defendant owed a legal duty to Plaintiff(s) and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;
- Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;
- Whether Defendant's failure to institute adequate protective security measures amounted to negligence;
- Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and
- Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

143.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by RPM.

## CAUSES OF ACTION

## FIRST COUNT

### Negligence
### (On behalf of Plaintiff(s) and All Class Members)

144.    Plaintiff(s) re-allege and incorporate by reference the paragraphs above as if fully

CLASS ACTION COMPLAINT - 31

MASON LLP
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015 ~ (202) 429-2290

set forth herein.

145.    RPM owed a duty to Plaintiff(s) and Class members to exercise reasonable care in safeguarding and protecting their PII in its possession, custody, or control.

146.    Plaintiff(s) and the Class Members entrusted their PII to Defendant with the understanding that Defendant would safeguard their information.

147.    RPM had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff(s) and Class Members could and would suffer if the PII were wrongfully disclosed.

148.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer network—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

149.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

150.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

151.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

MASON LLP
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015 ~ (202) 429-2290

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' PII; and

e. Failing to detect in a timely manner that Class Members' PII had been compromised.

152. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the industry.

153. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

154. There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII and the harm suffered, and an imminent and substantial risk of harm that will be suffered by Plaintiff(s) and the Class.

155. As a result of Defendant's negligence, Plaintiff(s) and the Class Members have suffered and will continue to suffer damages and injury including, but not limited to: out-of-pocket expenses associated with procuring robust identity protection and restoration services; increased risk of future identity theft and fraud, the costs associated therewith; time spent monitoring, addressing and correcting the current and future consequences of the Data Breach; and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

156. Plaintiff(s) and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

CLASS ACTION COMPLAINT - 33

157.    Plaintiff(s) and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## SECOND COUNT

### Negligence *Per Se*

### (On Behalf of Plaintiff(s) and All Class Members)

158.    Plaintiff(s) re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

159.    Section 5 of the FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant's, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

160.    RPM violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of the Data Breach for companies of Defendants' magnitude, including, specifically, the immense damages that would result to Plaintiff(s) and Members of the Class due to the valuable nature of the PII at issue in this case—including Social Security numbers.

161.    Defendants' violations of Section 5 of the FTCA constitute negligence per se.

162.    Plaintiff(s) and members of the Class are within the class of persons that the FTCA was intended to protect.

163.    The harm that occurred as a result of the Data Breach is the type of harm the

CLASS ACTION COMPLAINT - 34

FTCA was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff(s) and members of the Class.

164.    As a direct and proximate result of Defendant's negligence per se, Plaintiff(s) and members of the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII of customers in its continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff(s) and members of the Class.

165.    Additionally, as a direct and proximate result of Defendants' negligence per se, Plaintiff(s) and members of the Class have suffered and will suffer the continued risks of exposure of their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession.

CLASS ACTION COMPLAINT - 35

166.    Plaintiff(s)' and Class Members' Personal Information constitutes personal property that was stolen due to RPM's negligence, resulting in harm, injury and damages to Plaintiff(s) and Class Members.

167.    RPM's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff(s)' and Class Members' unencrypted Personal Information.

168.    Plaintiff(s) and Class Members have suffered and will continue to suffer damages as a result of RPM's conduct. Plaintiff(s) and Class Members seek damages and other relief as a result of RPM's negligence.

### THIRD COUNT

**Intrusion Upon Seclusion / Invasion of Privacy**

**(On Behalf of Plaintiff(s) and All Class Members)**

169.    Plaintiff(s) re-allege the above allegations as if fully set forth herein.

170.    The State of Washington recognizes the tort of Intrusion upon Seclusion, and adopts the formulation of that tort found in the Restatement (Second) of Torts, which states:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

*Restatement (Second) of Torts* § 652B (1977).

171.    Plaintiff(s) and Class Members had a reasonable expectation of privacy in the Private Information Defendant mishandled.

172.    Defendant's conduct as alleged above intruded upon Plaintiff(s)' and Class Members' seclusion under common law.

173.    By intentionally failing to keep Plaintiff(s)' and Class Members' Private Information safe, and by intentionally misusing and/or disclosing said information to

CLASS ACTION COMPLAINT - 36

unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiff(s)' and Class Members' privacy by:

    a.    Intentionally and substantially intruding into Plaintiff(s)' and Class Members' private affairs in a manner that identifies Plaintiff(s) and Class Members and that would be highly offensive and objectionable to an ordinary person; and

    b.    Intentionally publicizing private facts about Plaintiff(s) and Class Members, which is highly offensive and objectionable to an ordinary person; and

    c.    Intentionally causing anguish or suffering to Plaintiff(s) and Class Members.

174.    Defendant knew that an ordinary person in Plaintiff(s)' or Class Members' position would consider Defendant's intentional actions highly offensive and objectionable.

175.    Defendant invaded Plaintiff(s)' and Class Members' right to privacy and intruded into Plaintiff(s)' and Class Members' private affairs by intentionally misusing and/or disclosing their Private Information without their informed, voluntary, affirmative, and clear consent.

176.    Defendant intentionally concealed from and delayed reporting to Plaintiff(s) and Class Members a security incident that misused and/or disclosed their Private Information without their informed, voluntary, affirmative, and clear consent.

177.    The conduct described above was at or directed at Plaintiff(s) and the Class Members.

178.    As a proximate result of such intentional misuse and disclosures, Plaintiff(s)' and Class Members' reasonable expectations of privacy in their Private Information was unduly frustrated and thwarted. Defendant's conduct amounted to a substantial and serious invasion of Plaintiff(s)' and Class Members' protected privacy interests causing anguish and suffering such that an ordinary person would consider Defendant's intentional actions or inaction highly offensive and objectionable.

CLASS ACTION COMPLAINT - 37

179.    In failing to protect Plaintiff(s)' and Class Members' Private Information, and in intentionally misusing and/or disclosing their Private Information, Defendant acted with intentional malice and oppression and in conscious disregard of Plaintiff(s)' and Class Members' rights to have such information kept confidential and private. Plaintiff(s), therefore, seek an award of damages on behalf of themselves and the Class.

### FOURTH COUNT

**Unjust Enrichment**

**(On Behalf of Plaintiff(s) and All Class Members)**

180.    Plaintiff(s) re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

181.    Plaintiff(s) and Class Members conferred a monetary benefit on Defendant in the form of the provision of their PII and Defendant would be unable to engage in its regular course of business without that PII.

182.    Defendant appreciated that a monetary benefit was being conferred upon it by Plaintiff(s) and Class Members and accepted that monetary benefit.

183.    However, acceptance of the benefit under the facts and circumstances outlined above make it inequitable for Defendant to retain that benefit without payment of the value thereof. Specifically, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff(s)' and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff(s) and Class Members by utilizing cheaper, ineffective security measures. Plaintiff(s) and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite data security.

CLASS ACTION COMPLAINT - 38

184.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary benefit belonging to Plaintiff(s) and Class Members, because Defendant failed to implement appropriate data management and security measures.

185.    Defendant acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

186.    If Plaintiff(s) and Class Members had known that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

187.    Plaintiff(s) and Class Members have no adequate remedy at law.

188.    As a direct and proximate result of Defendant's conduct, Plaintiff(s) and Class Members have suffered or will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff(s) and Class Members.

189.    As a direct and proximate result of Defendant's conduct, Plaintiff(s) and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

CLASS ACTION COMPLAINT - 39

190. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff(s) and Class Members, proceeds that they unjustly received from them.

**FIFTH COUNT**

**Declaratory Judgment**

**(On Behalf of Plaintiff(s) and All Class Members)**

191. Plaintiff(s) re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

192. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

193. An actual controversy has arisen in the wake of the RPM data breach regarding its present and prospective common law and other duties to reasonably safeguard its customers' Personal Information and whether RPM is currently maintaining data security measures adequate to protect Plaintiff(s) and Class members from further data breaches that compromise their Private Information.

194. Plaintiff(s) allege that RPM's data security measures remain inadequate. Plaintiff(s) will continue to suffer injury because of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

195. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a. RPM continues to owe a legal duty to secure consumers' Private

CLASS ACTION COMPLAINT - 40

Information and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and various states' statutes;

b.  RPM continues to breach this legal duty by failing to employ reasonable measures to secure consumers' Private Information.

196.    The Court also should issue corresponding prospective injunctive relief requiring RPM to employ adequate security protocols consistent with law and industry standards to protect consumers' Private Information.

197.    If an injunction is not issued, Plaintiff(s) and Class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at RPM. The risk of another such breach is real, immediate, and substantial. If another breach at RPM occurs, Plaintiff(s) and class members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

198.    The hardship to Plaintiff(s) and class members if an injunction does not issue exceeds the hardship to RPM if an injunction is issued. Among other things, if another massive data breach occurs at RPM, Plaintiff(s) and class members will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to RPM of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and RPM has a pre-existing legal obligation to employ such measures.

199.    Issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at RPM, thus eliminating the additional injuries that would result to Plaintiffs and the millions of consumers whose Private Information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff(s) pray for judgment as follows:

CLASS ACTION COMPLAINT - 41

1    A.    For an Order certifying this action as a class action and appointing Plaintiff(s) and

2    their counsel to represent the Class;

3    B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct

4    complained of herein pertaining to the misuse and/or disclosure of Plaintiff(s)' and Class

5    Members' Private Information, and from refusing to issue prompt, complete and accurate

6    disclosures of its Data Breach to Plaintiff(s) and Class Members;

7    C.    For equitable relief compelling Defendant to utilize appropriate methods and

8    policies with respect to consumer data collection, storage, and safety, and to disclose with

9    specificity the type of Private Information compromised during the Data Breach;

10    D.    For equitable relief requiring restitution and disgorgement of the revenues

11    wrongfully retained as a result of Defendant's wrongful conduct;

12    E.    For declaratory relief as requested;

13    F.    Ordering Defendant to pay for lifetime credit monitoring services for Plaintiff(s)

14    and the Class;

15    G.    For an award of actual damages, compensatory damages, statutory damages, and

16    statutory penalties, in an amount to be determined, as allowable by law;

17    H.    For an award of punitive damages, as allowable by law;

18    I.    For an award of attorneys' fees and costs, and any other expense, including expert

19    witness fees;

20    J.    Pre- and post-judgment interest on any amounts awarded; and

21    K.    Such other and further relief as this Court may deem just and proper.

22

23    DATED this 19th day of January 2023.

24                                        **FRANK FREED SUBIT & THOMAS LLP**

25                                        By: */s/ Michael C. Subit*
26                                        Michael C. Subit, WSBA #29189
                                          705 Second Avenue, Suite 1200
27                                        Seattle, WA 98104

CLASS ACTION COMPLAINT - 42                MASON LLP
                                          5335 Wisconsin Avenue, NW, Suite 640
                                          Washington, DC 20015 ~ (202) 429-2290

Telephone: 206.624.6711
msubit@frankfreed.com

*Local Counsel for Plaintiff(s)*

**MASON LLP**

Gary E. Mason*
Danielle L. Perry*
Lisa A. White*
5101 Wisconsin Avenue, NW, Suite 305
Washington, DC 20016
Telephone: 202.429.2290
gmason@masonllp.com
dperry@masonllp.com
lwhite@masonllp.com

*Attorneys for Plaintiff(s)*

*pro hac vice applications for admission to be filed.*

CLASS ACTION COMPLAINT - 43

MASON LLP
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015 ~ (202) 429-2290